## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
## NORTHERN DIVISION

AMY GOLEY                                                          **PLAINTIFF**

VS.



NO. _3:15cv277 DPJ-FKB_

ELWOOD STAFFING INC.;
MARK S. ELWOOD;
MICHAEL STOCKARD JR.;
LIA ELLIOTT                                          **DEFENDANTS**

                                                    **JURY TRIAL DEMANDED**

### COMPLAINT

Plaintiff Amy Goley ("Plaintiff" or "Goley") brings this civil action to recover back wages, compensatory damages, and punitive damages for the Defendants' violations of the Americans with Disabilities Act of 1990 ("ADA"), 42 U.S.C. §§ 12101 *et seq.*, as well as numerous violations of the common law. For cause, Goley shows the Court as follows:

### PARTIES

1.      The Plaintiff, Amy Goley, is an adult resident citizen of Edmond, Oklahoma.

2.      Defendant Elwood Staffing Services, Inc. is an Indiana corporation with its principal place of business located at 4111 Central Avenue, Columbus, Indiana 47203.   Elwood Staffing owns and operates a staffing services company at 1149 Old Fannin Road, Suite 21, Brandon, Mississippi 39047. Elwood may be served with process by service upon its registered agent Corporation Service Company, 506

South President Street, Jackson, Mississippi 39201-5301.

3.    Defendant Mark S. Elwood, an officer of Elwood Staffing, may served with process at, 4111 Central Avenue, Columbus, Indiana 47203.

4.    Defendant Michael Stockard Jr., an officer of Elwood Staffing, may be served with process at, 1484 McGuire Rd., Birmingham, Alabama 35216.

5.    Defendant Lia Elliott, an officer of Elwood Staffing, may be served with process at 4111 Central Avenue, Columbus, Indiana 47203.

## JURISDICTION AND VENUE

6.    This Court has subject matter jurisdiction of Goley's federal claims pursuant to 28 U.S.C. § 1331. This Court has supplemental jurisdiction over the remaining claims pursuant to 28 U.S.C. §1367, because the claims are so related to the federal claims that they form part of the same case or controversy. Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b), because Plaintiff was employed in this division and district, and a substantial portion of the conduct giving rise to Plaintiff's claims occurred within this division and district. *See also* 42 U.S.C. § 2000e-5(f)(3).

Additionally, Plaintiff has satisfied all procedural requirements prior to commencing this action. Plaintiff filed a charge with the Jackson, Mississippi field office of the EEOC in accordance with its time limitations. Following the non-response of Elwood Staffing Services, she was subsequently issued a Right to Sue Letter on March 11, 2015 and has therefore exhausted her administrative prerequisites.

## BACKGROUND FACTS

### I.  GOLEY'S SUCCESS AT SOS STAFFING IN FLOWOOD, MISSISSIPPI

7.   Amy Goley was hired in August of 2012 as a Branch Manager for SOS Employment Group, in their Flowood, Mississippi office.  SOS is a temporary staffing and recruiting company headquartered at 2560 South Decker Lake Road, Salt Lake City, Utah.

8.   Goley's original assignment in 2012 was to start the first Mississippi location for SOS and potential additional locations for the company.

9.   Goley resided at 3031 Windwood Circle, Flowood, Mississippi, and had been a resident of Rankin County, Mississippi since January of 2006.

10. Goley was immediately successful.  Indeed, in the first fourth months of operation her branch delivered the highest month-end profit margins and direct hire sales for all 140+ branches nationwide.

11. SOS had a long-established history of serving the oil and gas industry and Goley had unique industry knowledge and networking access, having grown up and worked in a family-owned oilfield parts and service company.

12. Goley was under a non-compete agreement with her former employer, Express Employment Group, and was unable to sell in the tri-county area. However, she successfully developed a strategy that allowed her to sell and recruit from a distance. Her sales included the largest accounts doing business with the local office, Cameron Manufacturing in Vicksburg, Mississippi, and Quality Manufacturing in Columbia, Mississippi.

13. The office Goley opened was the only office opened by the company from the ground-up without the aid of existing clients in the area or the result of acquisition. She personally sold and recruited more direct hire business than the average executive recruiter for the company in 2013 and her profit margins were over 28%, compared to a company average of less than 15% per branch. She did this with just one employee, Cortney Ainsworth, and in a rented 10x10 office space they shared.

II.    ELWOOD'S PURCHASE OF SOS: FROM MISSISSIPPI TO OKLAHOMA

14. At the end of January, 2013, SOS was purchased by the privately-held Elwood Staffing Services, Inc. Her initial manager at SOS, Rick Ruenes, left the company and she began reporting to Mike Stockard, a Senior Vice President for Elwood and principal. Stockard is also the executive in charge of all sales.

15. Stockard, who was based out of the Elwood offices in Birmingham, Alabama, initially demonstrated a respect for Goley's skills and referred internal staff to her for assistance. They communicated daily and had a healthy employee/employer relationship.

16. In the spring of 2013, in light of her tremendous success with the company, Goley was offered the management of the Oklahoma City, Oklahoma Elwood location, which would have been a significant raise due to the size of the staff and budget. During a visit by Stockard to the Jackson, Mississippi branch to meet with Goley and her staffing manager to prepare for the transition, it was disclosed to Stockard that Goley was a recovering alcoholic. This was not a secret to those who knew her and she was known to be involved in the recovery community as well as to speak on

addiction to church, youth, and prison groups in the Jackson area.

III.   THINGS "GO SOUTH" ONCE GOLEY IS "REGARDED OR PERCEIVED AS" SUFFERING FROM A DISABIILITY

17.   Goley's relationship with Elwood immediately began to change for the worse. Goley's management offer was rescinded by District Manager Holly Carattini, on the purported basis that after a visit from Kris Cooper, Vice President of Field Operations for SOS, a manager based at the former SOS headquarters in Salt Lake who reported to Stockard, she felt corporate needed more sales before adding payroll to her budget. Instead, Goley was offered a sales role, a demotion to a position with significantly less responsibilities and authority, titled Business Development Manager, in Oklahoma City, where Goley's husband had already relocated.  Goley accepted the position with a view towards her later being reinstated in a true management position.

18.   Prior to her arrival in Oklahoma City, and counter to the claims of Carattini regarding the position previously offered to Goley, Carattini requested the promotion of Krystle McKim to the role of Office Manager and for two additional positions to be added.

19.   Despite the setbacks caused by Elwood's shifting plans for her, Goley was immediately successful in Oklahoma City and the branch had its highest June in recent history based on her first month's sales. Goley's sales ability was well-known among the Elwood managers and her assistance in the Houston branch was requested by James Perkins, a Regional Vice President for Elwood. Perkins indicated success would offer more opportunity for Goley to regain her prior management role or potentially become a Regional Sales Manager.

20.   Eager to advance, Mrs. Goley accepted the challenge, recovering 90% of the lost revenue from the previous year within the final 60 days of 2013.  Goley was also still responsible for the sales efforts in Oklahoma, traveling to Houston every other week and leaving her husband and 4 children in Oklahoma.  No management offer was extended or additional compensation offered for the increased workload, however.  Reporting to two managers also became increasingly stressful and at one point, Goley offered her resignation.  However, the decision was made to have her report solely to Perkins moving forward, but she was told she would still be able to sell in both areas.

21.   In January 2014, Goley traveled from Houston to attend January's sales meeting in Indianapolis. At the above mentioned convention, Goley was passed over for many awards that she felt she had earned including the highest gross margin overall. Stockard said that they had not included her sales in Mississippi as she had been a branch manager when those sales occurred.

IV.   ELWOOD'S CULTURE OF DISCRIMINATORY CONDUCT

22.   In early February of 2014, Goley arrived back in Mississippi to assist the branch in sales and training. On arrival, local staff members Tanya Blossom and Cortney Ainsworth reported that the prior week, they had been visited by Kim Staggs, who had recently been promoted to Regional Sales Manager.

23.   During her visit Staggs had asked them several inappropriate questions about Goley, shared personal details of other Elwood staff members, and said that managers thought Goley had "fallen off the wagon" because of her weight loss and

high energy at the sales conference.

24. Additionally, Staggs had also reviewed Blossom's sales calls and inappropriately returned a negative report to Blossom's manager that Blossom's need to stop and check her blood sugar after lunch, due to Blossom's diabetes, had detracted from her sales day. Staggs indicated that Blossom should probably be fired. This report had been delivered verbally to Blossom the day before Goley's arrival by Blossom's Area Manager, Donna Smith.

25. Because Staggs was a new manager, and wanting to put the matter to rest to make the most of her time with Blossom, Goley recommended they individually call John DeLap, the Global Director of Human Resources for Elwood, and report the potential ADA and Title VII violations of Staggs. DeLap told each that if they ever felt the incident impeded their employment or advancement to call and that disciplinary action and training would follow. Luci Powell, Stagg's supervisor and National Sales Director for the company, called Goley to apologize and say Staggs must have heard the managers wrong, they had been talking about Goley's illness the previous year and wondered if she was on medication or treatment. Believing Powell's sincerity, and not feeling the opinion of Staggs could harm her as Staggs was not in any supervisory position over her, Goley believed the matter to be over.

26. Following her internal complaint regarding Staggs, Goley's sales roles in both Oklahoma and Houston were given to others. Feeling that no promotions would be available in the near future and already at a significantly decreased income following the loss of opportunities in Houston and OKC, Goley once again offered her

resignation in April of 2014 if the company did not see a future for her. After a meeting of the Executive Committee, Perkins asked Goley to fly to his base in Atlanta where he indicated new opportunities in Abilene and Hobbs. He also promised to take her requests to Stockard about potentially being recognized for the sales manager work she was already doing by adding a regional Sales Manager role to the Texas/Oklahoma area or giving her a dedicated recruiter and allowing her to focus on the national new oil and gas relationships she had developed. Goley agreed to stay based on those promises.

27.    Although she continued to follow up on the promises made by Perkins, Mrs. Goley was never given another dedicated role in the company. Instead, from May of 2014 until her termination in October, she had to increase her travel in order to attempt to find opportunities in open territories. The rest of her time was spent training new sales people or branch managers at the request of Perkins.

## V.    LUCI POWELL SPILLS THE BEANS

28.    In late September 2014, Luci Powell left the company. Having developed a mutual respect for Goley integrity and abilities while working together at Elwood, Powell felt that Mrs. Goley should know that her call in February regarding Kim Stagg's "misunderstanding" of managers' conversations had not been entirely true and she apologized. The statements that Kim Staggs had previously made to the Jackson branch had come directly from Stockard who had ridden home from the sales convention in Indianapolis to Birmingham with Staggs. He had discussed the potential for Goley's falling "off the wagon" as a worry in her employment. Powell

stated that, not knowing Goley at the time, she agreed to assist Stockard when he called asking her to assist in keeping his name out of it and "smoothing things over with Goley".

29. In early October 2014, Goley was asked to come to Odessa, Texas to meet with a client who had been referred to her in his previous position in Houston and needed assistance in several positions. Goley took the local Customer Service/Office Manager Del'Ynda Young to the initial client meeting. It was then decided that Goley would lead the recruiting efforts for the direct hire positions and solicit the assistance of several branches, while Del'Ynda's local team would get the client candidates immediately for his temporary openings of receptionist and HRIS lead. Goley planned a return trip to follow up the week of October 20th which coincided with the city's annual oil show.

30. Elwood had booth space at the Odessa oil show and other employees would be attending. Although Odessa was Goley's hometown and she offered to stay with family to keep costs low, Young said the corporate condominium would have a room available as only the New Mexico District Manager, Holly Lathrop, would be using it during the show.

31. Goley later met with the client who indicated the local branch had failed to deliver any of the temporary positions, and the client refused to work further with Young. He was pleased with Goley's efforts, however, and asked her to continue on the project and followed their meeting by sending her the details of the full order. The order totaled over $2 million in revenue over twelve months and would give Goley a

commission of close to $200,000.

32.   Needing assistance without the local branch, Goley called the new Regional Vice President Ron Griffin, at James Perkins' direction and he agreed to run point and told Goley to include Holly Lathrop to lead recruiting efforts. At his direction, she sent him the full details of the order and copied Lathrop and him on an email of apology and action plan for the client.

VI.   THE OIL SHOW AND THE SCANDALOUS "TRICK OR TREATS"

33.   Goley attended the oil show in Odessa on Wednesday, October 22, 2014, and took the visiting Business Development Manager hired in Abilene, Kani Thompson, with her for a trade show game of "trick or treat" given the time of year. The items Goley had purchased were of both the trick and treat variety and she took photos of some prior for the sole purpose of writing a funny story on the internal corporate blog she hosted called "Goley's Sales Junkies". She gave out 5 items in exchange for cards as well as letting the prospects "guess what she sold". The items given to those she did not know included Halloween makeup and costume pieces and gift cards. In addition, she gave away a bottle of generic stool softener to a booth that she had met previously and whom she knew would appreciate the joke. They gathered several cards and Goley left the bowl of remaining trick or treat items at the booth. She then left the event to attend a follow-up event sponsored by a prospect.

34.   That evening, at the condominium, Goley shared her surprise at meeting Thompson, as she had been led to believe she would be assisting in the sales in Abilene as soon as the branch was adequately staffed to support new sales. She also

shared her new knowledge of Stockard's attempt to cover up his true opinion of her and wondered if it would affect her plan to apply for the Regional Field Manager position over New Mexico and West Texas.

35.   The following day, October 23, 2014, Perkins phoned Goley at the condo and asked when she planned to leave town. She indicated early afternoon, but returned to the show after a prospect called and said he would be available after lunch. She returned and was meeting with the client when Perkins again called asking why she had not left. She told him about the potential client, but he said "I told Stockard you were on the road home already." Goley was very confused at his agitation as the nature of her job was supposed to be sales. She told Perkins that she was upset by this and had no intention of driving the long distance that night for safety reasons and intended to leave the next morning. Perkins called back to say Stockard had approved her staying but to leave early and call him on arriving home.

## VII.   ELWOOD'S DISCRIMINATORY TERMINATION OF GOLEY UNDER THE PRETEXT OF A "DIFFERENCE IN PHILOSOPHY"

36.   Goley worked on additional recruiting and found a flight out the following morning, October 24, 2014, landing around 10:00 a.m.  Upon landing, Goley sent email messages to clients and updates to Stockard and Perkins on things they had requested in the hopes whatever was wrong could soon be cleared up.  She also entered the orders from the new client.

37.   Soon after sending the emails, her computer operation was taken over by IT and her phone rang. Perkins was calling to terminate her. He declined an answer when she asked why she was terminated, saying only "a difference in philosophy".

Her corporate card had been discontinued and Goley had to borrow money from a stranger to leave the lot and drive home.

38.  Dated the same day of her dismissal was a letter from Human Resources reminding her of her non-competition agreement signed as a Branch Manager in Mississippi and a copy of both it and her acknowledgement of assignment to Elwood after the purchase of SOS.

39.  Goley in turn sent a communication to John DeLap indicating that she believed her dismissal to be the result of Stockard's involvement in the events of February violating her statutory rights and retaliatory for the several reports of violations they had allowed and her suspicions of others in the commission and reporting practices. She asked for them to review the reasons for her termination.

40.  Getting no response, she also sent a direct communication to CEO Mark Elwood, explaining her limited knowledge of why she had been terminated and requesting the termination be changed to reflect that it was not for cause, but a reduction in force, and allow for severance since she had offered to resign several times for the very reason given by Perkins for terminating her but they had persuaded her to stay and promised changes. She also sent an offer of waiver and release, requested a clarification on her non-compete in light of her having had no territory, and a demand for payment of PTO and back commissions.

VIII.   ELWOOD SUDDENDLY COMMUNICATES A NEWFOUND AND BLATANTLY PRETEXTUAL "CAUSE" FOR GOLEY'S TERMINATION IN ORDER TO DEFEAT GOLEY'S UNEMPLOYMENT CLAIM AND THREATENS TO SUE IF GOLEY TRIES TO FIND OTHER WORK

41.   The response of Lia Elliott, counsel for Elwood, was that Goley had been terminated for cause and therefore did not have the right to her accrued PTO under the Elwood policy and denied all of her requests, saying the back commissions would be "looked into". Her non-compete would not be redefined and Elliott inferred they intended to pursue litigation in any area Goley ever worked or travelled. Elliott also issued a demand for all of the property of Elwood with a threat of calling the authorities if not received by the end of the week.

42.   Goley applied for unemployment and was initially denied after Elwood protested. On filing an appeal, the documents of support were sent to Goley and the reasons for her dismissal were finally discovered.

43.   Following a request for documentation by the unemployment commission, in light of the fact no documentation of discipline or performance issues could be found prior to Goley's termination, Elwood had obtained obviously biased and non-contemporaneous statements of Young, Lathrop, and Thompson specifically related to the oil show. Those statements inferred unfounded suspicions of Goley using drugs or alcohol, and irrelevant comments regarding her non-attendance at certain parts of the oil show she was not scheduled to attend.  Additional references to items left in her trick or treat bucket and pictures were sent, although the materials were presented out of context and were purposefully deceptive.

## IX.   ELWOOD ACTUALLY ADMITS TO DISCRIMINATORY CONDUCT

44.  The very gravamen of Elwood's position was that they feared that Goley had "fallen off of the wagon," as Stockard had so elegantly stated before, despite the fact that there was not a single shred of evidence that Goley had engaged in any misconduct related to drugs or alcohol.  No one claimed to have seen her drink, much less drink to excess; no one claimed to have smelled alcohol on her breath, or seen her use or possess alcohol or drugs; there was no evidence that Goley had done any such thing.  No drug or alcohol tests were offered.  No counseling.  No debriefing session or chance to offer an explanation for anything.  Nothing but "you're fired," and the reason offered nothing more than a pretextual excuse for unlawful discrimination.

45.  Elwood's stated position, in fact, was an admission of a violation of settled law: Elwood *perceived or regarded* Goley as an active alcoholic—a well-established disability—but did so mistakenly and yet with intentional animus and discriminatory bias towards those with disabilities.

## X.   GOLEY PROVES ELWOOD'S UNLAWFUL AND DISCRIMINATORY CONDUCT AND ELWOOD DOESN'T EVEN BOTHER TO SHOW UP

46.  In her appeal of the denial of her unemployment benefits, Goley submitted solid documentation in support of her request for benefits, refuting all statements made by Elwood and its witnesses.  Goley won the appeal for benefits on December 29, 2014.  No representative of Elwood even bothered to show up to defend its unlawful conduct.

47.  Goley has been unable to secure employment in her field based on the threat of litigation Elwood imposes on companies hiring former staff and the active

defamation of her name among internal and external industry members. Mrs. Lathrop has since put in the position that Goley expressed an interest in.

48. In light of Stockard's improper, illegal, and discriminatory statements regarding Goley, and the similar discriminatory statements made by others at Elwood, it is obvious that Elwood's decision to demote Goley, expose her to ongoing and repeated humiliation, harassment, and unfair scrutiny, to remove her from all scheduled training and certification plans given to her peers, taking away her territories, refusing to promote or pay her equally for the similar work of others, and directing Perkins to dismiss Goley based on the unreliable, baseless, and biased statements of those in the unemployment documents, constitutes unlawful discrimination on the basis of a perceived disability. Even worse, thinking Goley might have been abusing alcohol or any other substance while she was in Texas and then not only encouraging her to drive home to Oklahoma, but becoming angry when she didn't, makes this conduct even more reckless, indecent and malicious.

49. The documents sent to the unemployment commission show that the policy manual used in deciding to dismiss was the original manual given to her by SOS in August of 2012. That manual also includes a detailed procedure for handling suspicion of substance use that was not followed by Elwood in this case.

50. After Elwood discovered Goley was a recovering alcoholic, Goley received only 3 of the 70 necessary weekly ride-along management training sessions for the Business Development Position, one each with Perkins, Powell, and Carattini. Her requests for certification in the company's sales training went unanswered, then were

denied because the parameters were geared toward territory sales and she had been tasked to focus on a single company which made her ineligible. She was never given a trainer to assist in completing her Certified Staffing Professional testing, a certification extended to every other sales, management and branch employee within their first 6 months of hire. She was never given the company's employee referral compensation for those she referred in Jackson or Oklahoma City. She was never given compensation for the company's use of her personally developed training and community programs developed outside of her employment at Elwood.

## CLAIMS FOR RELIEF

## COUNT I (Disability Discrimination)

51. Plaintiff realleges the foregoing paragraphs as if fully rewritten herein.

52. Plaintiff is a qualified individual with a disability, is perceived as disabled, and/or has a record of a disability, as defined by the ADA.

53. Plaintiff could perform the essential functions of her position with or without reasonable accommodation.

54. Defendants discriminated against Goley with respect to her terms, conditions and privileges of employment as well as her discharge.

62. Defendants' acts in discriminating against Plaintiff on account of her disability, perceived disability and/or record of a disability include, but are not limited to, treating her less favorably than similarly situated non-disabled employees, and/or forcing her to accept a demotion and ultimately termination on account of her

disability, perceived disability and/or record of a disability, in violation of the ADAAA.

63. Defendants engage in a pattern and practice of discriminating against individuals with disabilities, perceived disabilities, and/or records of disability.

64. Defendants' actions were willful, wanton, malicious, and/or in reckless disregard of Plaintiff's rights.

65. As a direct and proximate result of Defendant's unlawful conduct, Plaintiff has been injured and is entitled to judgment and compensation pursuant to federal law.

## COUNT II (Disability Retaliation)

66. Defendants discriminated against Goley because she opposed any act or practice made unlawful by the ADA or because she made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under the ADA.

67. Defendants also coerced, intimidated, threatened, and/or interfered with Goley in the exercise or enjoyment of her statutory rights.

68. Defendants intentionally retaliated against Goley because of her opposition to disability discrimination and her support for and participation in a claim of disability discrimination, with respect to her terms, conditions and privileges of employment as well as her discharge.

69. Defendants' intentional retaliation against Goley violated the ADA and was malicious and taken in reckless disregard of Goley's statutory rights.

## COUNT III (Disability Harassment)

70.   During her employment with Elwood Staffing, Goley was subjected to a hostile work environment on account of her perceived disability.

71.   The Defendants' harassment of Goley violated the ADA.

## COUNT IV (Defamation)

72.   Plaintiff realleges the foregoing paragraphs as if fully rewritten herein.

73.   Defendants and their agents told Plaintiff's coworkers that Plaintiff had "fallen off of the wagon" and was abusing alcohol.

74.   Defendants' statements were false, malicious, and defamatory per se.

75.   Defendants' statements damaged Plaintiff in her trade and profession.

76.   At all times material, Defendants acted with actual malice, in that they knew or should have known that the statements about Plaintiff were false, and that making the statements would cause Plaintiff damage in her trade and profession.

77.   Plaintiff was terminated from her employment with Defendant and has suffered embarrassment, humiliation, emotional distress, and injury to her professional and personal reputation because of these defamatory statements.

78.   Defendant's actions were intentional, willful, wanton, malicious, and/or in reckless disregard of Plaintiff's rights.

83.   As a direct and proximate result of Defendant's unlawful conduct, Plaintiff has been damaged and is entitled to judgment.

## CLAIM V (Tortious Invasion of Privacy)

84.   Plaintiff realleges the foregoing paragraphs as if fully rewritten herein.

Respectfully submitted, this the 10th day of April, 2015.

By: _____

Bradley S. Clanton (MS Bar No. 10505)
CLANTON LEGAL GROUP, PLLC
P.O. Box 4781
Jackson, Mississippi 39296
Direct: (601) 454-8794
Toll Free: (844) 425-2686
Facsimile: (866) 421-9918
Email: brad@clantonlegalgroup.com

Counsel for the Plaintiff

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
NORTHERN DIVISION

AMY GOLEY                                                                      **PLAINTIFF**

VS.                                                             NO. _3:15cv277 DPJ-FKB_



ELWOOD STAFFING INC.;
MARK S. ELWOOD;
MICHAEL STOCKARD JR.;
LIA ELLIOTT                                                      **DEFENDANTS**

**JURY TRIAL DEMANDED**

## COMPLAINT

Plaintiff Amy Goley ("Plaintiff" or "Goley") brings this civil action to recover back wages, compensatory damages, and punitive damages for the Defendants' violations of the Americans with Disabilities Act of 1990 ("ADA"), 42 U.S.C. §§ 12101 *et seq.*, as well as numerous violations of the common law. For cause, Goley shows the Court as follows:

### PARTIES

1.   The Plaintiff, Amy Goley, is an adult resident citizen of Edmond, Oklahoma.

2.   Defendant Elwood Staffing Services, Inc. is an Indiana corporation with its principal place of business located at 4111 Central Avenue, Columbus, Indiana 47203.   Elwood Staffing owns and operates a staffing services company at 1149 Old Fannin Road, Suite 21, Brandon, Mississippi 39047.  Elwood may be served with process by service upon its registered agent Corporation Service Company, 506

South President Street, Jackson, Mississippi 39201-5301.

3.    Defendant Mark S. Elwood, an officer of Elwood Staffing, may served with process at, 4111 Central Avenue, Columbus, Indiana 47203.

4.    Defendant Michael Stockard Jr., an officer of Elwood Staffing, may be served with process at, 1484 McGuire Rd., Birmingham, Alabama 35216.

5.    Defendant Lia Elliott, an officer of Elwood Staffing, may be served with process at 4111 Central Avenue, Columbus, Indiana 47203.

JURISDICTION AND VENUE

6.    This Court has subject matter jurisdiction of Goley's federal claims pursuant to 28 U.S.C. § 1331.  This Court has supplemental jurisdiction over the remaining claims pursuant to 28 U.S.C. §1367, because the claims are so related to the federal claims that they form part of the same case or controversy.  Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b), because Plaintiff was employed in this division and district, and a substantial portion of the conduct giving rise to Plaintiff's claims occurred within this division and district.  *See also* 42 U.S.C. § 2000e-5(f)(3).

Additionally, Plaintiff has satisfied all procedural requirements prior to commencing this action. Plaintiff filed a charge with the Jackson, Mississippi field office of the EEOC in accordance with its time limitations. Following the non-response of Elwood Staffing Services, she was subsequently issued a Right to Sue Letter on March 11, 2015 and has therefore exhausted her administrative prerequisites.

## BACKGROUND FACTS

### I.   GOLEY'S SUCCESS AT SOS STAFFING IN FLOWOOD, MISSISSIPPI

7.   Amy Goley was hired in August of 2012 as a Branch Manager for SOS Employment Group, in their Flowood, Mississippi office.  SOS is a temporary staffing and recruiting company headquartered at 2560 South Decker Lake Road, Salt Lake City, Utah.

8.   Goley's original assignment in 2012 was to start the first Mississippi location for SOS and potential additional locations for the company.

9.   Goley resided at 3031 Windwood Circle, Flowood, Mississippi, and had been a resident of Rankin County, Mississippi since January of 2006.

10. Goley was immediately successful.  Indeed, in the first fourth months of operation her branch delivered the highest month-end profit margins and direct hire sales for all 140+ branches nationwide.

11. SOS had a long-established history of serving the oil and gas industry and Goley had unique industry knowledge and networking access, having grown up and worked in a family-owned oilfield parts and service company.

12. Goley was under a non-compete agreement with her former employer, Express Employment Group, and was unable to sell in the tri-county area. However, she successfully developed a strategy that allowed her to sell and recruit from a distance. Her sales included the largest accounts doing business with the local office, Cameron Manufacturing in Vicksburg, Mississippi, and Quality Manufacturing in Columbia, Mississippi.

13. The office Goley opened was the only office opened by the company from the ground-up without the aid of existing clients in the area or the result of acquisition. She personally sold and recruited more direct hire business than the average executive recruiter for the company in 2013 and her profit margins were over 28%, compared to a company average of less than 15% per branch. She did this with just one employee, Cortney Ainsworth, and in a rented 10x10 office space they shared.

II.   ELWOOD'S PURCHASE OF SOS: FROM MISSISSIPPI TO OKLAHOMA

14. At the end of January, 2013, SOS was purchased by the privately-held Elwood Staffing Services, Inc. Her initial manager at SOS, Rick Ruenes, left the company and she began reporting to Mike Stockard, a Senior Vice President for Elwood and principal. Stockard is also the executive in charge of all sales.

15. Stockard, who was based out of the Elwood offices in Birmingham, Alabama, initially demonstrated a respect for Goley's skills and referred internal staff to her for assistance. They communicated daily and had a healthy employee/employer relationship.

16. In the spring of 2013, in light of her tremendous success with the company, Goley was offered the management of the Oklahoma City, Oklahoma Elwood location, which would have been a significant raise due to the size of the staff and budget. During a visit by Stockard to the Jackson, Mississippi branch to meet with Goley and her staffing manager to prepare for the transition, it was disclosed to Stockard that Goley was a recovering alcoholic. This was not a secret to those who knew her and she was known to be involved in the recovery community as well as to speak on

addiction to church, youth, and prison groups in the Jackson area.

### III. THINGS "GO SOUTH" ONCE GOLEY IS "REGARDED OR PERCEIVED AS" SUFFERING FROM A DISABIILITY

17. Goley's relationship with Elwood immediately began to change for the worse. Goley's management offer was rescinded by District Manager Holly Carattini, on the purported basis that after a visit from Kris Cooper, Vice President of Field Operations for SOS, a manager based at the former SOS headquarters in Salt Lake who reported to Stockard, she felt corporate needed more sales before adding payroll to her budget. Instead, Goley was offered a sales role, a demotion to a position with significantly less responsibilities and authority, titled Business Development Manager, in Oklahoma City, where Goley's husband had already relocated. Goley accepted the position with a view towards her later being reinstated in a true management position.

18. Prior to her arrival in Oklahoma City, and counter to the claims of Carattini regarding the position previously offered to Goley, Carattini requested the promotion of Krystle McKim to the role of Office Manager and for two additional positions to be added.

19. Despite the setbacks caused by Elwood's shifting plans for her, Goley was immediately successful in Oklahoma City and the branch had its highest June in recent history based on her first month's sales. Goley's sales ability was well-known among the Elwood managers and her assistance in the Houston branch was requested by James Perkins, a Regional Vice President for Elwood. Perkins indicated success would offer more opportunity for Goley to regain her prior management role or potentially become a Regional Sales Manager.

20.  Eager to advance, Mrs. Goley accepted the challenge, recovering 90% of the lost revenue from the previous year within the final 60 days of 2013.  Goley was also still responsible for the sales efforts in Oklahoma, traveling to Houston every other week and leaving her husband and 4 children in Oklahoma.  No management offer was extended or additional compensation offered for the increased workload, however.  Reporting to two managers also became increasingly stressful and at one point, Goley offered her resignation.  However, the decision was made to have her report solely to Perkins moving forward, but she was told she would still be able to sell in both areas.

21.  In January 2014, Goley traveled from Houston to attend January's sales meeting in Indianapolis. At the above mentioned convention, Goley was passed over for many awards that she felt she had earned including the highest gross margin overall. Stockard said that they had not included her sales in Mississippi as she had been a branch manager when those sales occurred.

IV.    ELWOOD'S CULTURE OF DISCRIMINATORY CONDUCT

22.  In early February of 2014, Goley arrived back in Mississippi to assist the branch in sales and training. On arrival, local staff members Tanya Blossom and Cortney Ainsworth reported that the prior week, they had been visited by Kim Staggs, who had recently been promoted to Regional Sales Manager.

23.  During her visit Staggs had asked them several inappropriate questions about Goley, shared personal details of other Elwood staff members, and said that managers thought Goley had "fallen off the wagon" because of her weight loss and

high energy at the sales conference.

24. Additionally, Staggs had also reviewed Blossom's sales calls and inappropriately returned a negative report to Blossom's manager that Blossom's need to stop and check her blood sugar after lunch, due to Blossom's diabetes, had detracted from her sales day. Staggs indicated that Blossom should probably be fired. This report had been delivered verbally to Blossom the day before Goley's arrival by Blossom's Area Manager, Donna Smith.

25. Because Staggs was a new manager, and wanting to put the matter to rest to make the most of her time with Blossom, Goley recommended they individually call John DeLap, the Global Director of Human Resources for Elwood, and report the potential ADA and Title VII violations of Staggs. DeLap told each that if they ever felt the incident impeded their employment or advancement to call and that disciplinary action and training would follow. Luci Powell, Stagg's supervisor and National Sales Director for the company, called Goley to apologize and say Staggs must have heard the managers wrong, they had been talking about Goley's illness the previous year and wondered if she was on medication or treatment. Believing Powell's sincerity, and not feeling the opinion of Staggs could harm her as Staggs was not in any supervisory position over her, Goley believed the matter to be over.

26. Following her internal complaint regarding Staggs, Goley's sales roles in both Oklahoma and Houston were given to others. Feeling that no promotions would be available in the near future and already at a significantly decreased income following the loss of opportunities in Houston and OKC, Goley once again offered her

resignation in April of 2014 if the company did not see a future for her. After a meeting of the Executive Committee, Perkins asked Goley to fly to his base in Atlanta where he indicated new opportunities in Abilene and Hobbs. He also promised to take her requests to Stockard about potentially being recognized for the sales manager work she was already doing by adding a regional Sales Manager role to the Texas/Oklahoma area or giving her a dedicated recruiter and allowing her to focus on the national new oil and gas relationships she had developed. Goley agreed to stay based on those promises.

27.   Although she continued to follow up on the promises made by Perkins, Mrs. Goley was never given another dedicated role in the company. Instead, from May of 2014 until her termination in October, she had to increase her travel in order to attempt to find opportunities in open territories. The rest of her time was spent training new sales people or branch managers at the request of Perkins.

V.   LUCI POWELL SPILLS THE BEANS

28.   In late September 2014, Luci Powell left the company. Having developed a mutual respect for Goley integrity and abilities while working together at Elwood, Powell felt that Mrs. Goley should know that her call in February regarding Kim Stagg's "misunderstanding" of managers' conversations had not been entirely true and she apologized. The statements that Kim Staggs had previously made to the Jackson branch had come directly from Stockard who had ridden home from the sales convention in Indianapolis to Birmingham with Staggs. He had discussed the potential for Goley's falling "off the wagon" as a worry in her employment. Powell

stated that, not knowing Goley at the time, she agreed to assist Stockard when he called asking her to assist in keeping his name out of it and "smoothing things over with Goley".

29.  In early October 2014, Goley was asked to come to Odessa, Texas to meet with a client who had been referred to her in his previous position in Houston and needed assistance in several positions. Goley took the local Customer Service/Office Manager Del'Ynda Young to the initial client meeting. It was then decided that Goley would lead the recruiting efforts for the direct hire positions and solicit the assistance of several branches, while Del'Ynda's local team would get the client candidates immediately for his temporary openings of receptionist and HRIS lead. Goley planned a return trip to follow up the week of October 20th which coincided with the city's annual oil show.

30.  Elwood had booth space at the Odessa oil show and other employees would be attending. Although Odessa was Goley's hometown and she offered to stay with family to keep costs low, Young said the corporate condominium would have a room available as only the New Mexico District Manager, Holly Lathrop, would be using it during the show.

31.  Goley later met with the client who indicated the local branch had failed to deliver any of the temporary positions, and the client refused to work further with Young. He was pleased with Goley's efforts, however, and asked her to continue on the project and followed their meeting by sending her the details of the full order. The order totaled over $2 million in revenue over twelve months and would give Goley a

commission of close to $200,000.

32.   Needing assistance without the local branch, Goley called the new Regional Vice President Ron Griffin, at James Perkins' direction and he agreed to run point and told Goley to include Holly Lathrop to lead recruiting efforts. At his direction, she sent him the full details of the order and copied Lathrop and him on an email of apology and action plan for the client.

VI.   THE OIL SHOW AND THE SCANDALOUS "TRICK OR TREATS"

33.   Goley attended the oil show in Odessa on Wednesday, October 22, 2014, and took the visiting Business Development Manager hired in Abilene, Kani Thompson, with her for a trade show game of "trick or treat" given the time of year. The items Goley had purchased were of both the trick and treat variety and she took photos of some prior for the sole purpose of writing a funny story on the internal corporate blog she hosted called "Goley's Sales Junkies". She gave out 5 items in exchange for cards as well as letting the prospects "guess what she sold". The items given to those she did not know included Halloween makeup and costume pieces and gift cards. In addition, she gave away a bottle of generic stool softener to a booth that she had met previously and whom she knew would appreciate the joke. They gathered several cards and Goley left the bowl of remaining trick or treat items at the booth. She then left the event to attend a follow-up event sponsored by a prospect.

34.   That evening, at the condominium, Goley shared her surprise at meeting Thompson, as she had been led to believe she would be assisting in the sales in Abilene as soon as the branch was adequately staffed to support new sales. She also

shared her new knowledge of Stockard's attempt to cover up his true opinion of her and wondered if it would affect her plan to apply for the Regional Field Manager position over New Mexico and West Texas.

35. The following day, October 23, 2014, Perkins phoned Goley at the condo and asked when she planned to leave town. She indicated early afternoon, but returned to the show after a prospect called and said he would be available after lunch. She returned and was meeting with the client when Perkins again called asking why she had not left. She told him about the potential client, but he said "I told Stockard you were on the road home already." Goley was very confused at his agitation as the nature of her job was supposed to be sales. She told Perkins that she was upset by this and had no intention of driving the long distance that night for safety reasons and intended to leave the next morning. Perkins called back to say Stockard had approved her staying but to leave early and call him on arriving home.

## VII. ELWOOD'S DISCRIMINATORY TERMINATION OF GOLEY UNDER THE PRETEXT OF A "DIFFERENCE IN PHILOSOPHY"

36. Goley worked on additional recruiting and found a flight out the following morning, October 24, 2014, landing around 10:00 a.m. Upon landing, Goley sent email messages to clients and updates to Stockard and Perkins on things they had requested in the hopes whatever was wrong could soon be cleared up. She also entered the orders from the new client.

37. Soon after sending the emails, her computer operation was taken over by IT and her phone rang. Perkins was calling to terminate her. He declined an answer when she asked why she was terminated, saying only "a difference in philosophy".

Her corporate card had been discontinued and Goley had to borrow money from a stranger to leave the lot and drive home.

38.  Dated the same day of her dismissal was a letter from Human Resources reminding her of her non-competition agreement signed as a Branch Manager in Mississippi and a copy of both it and her acknowledgement of assignment to Elwood after the purchase of SOS.

39.  Goley in turn sent a communication to John DeLap indicating that she believed her dismissal to be the result of Stockard's involvement in the events of February violating her statutory rights and retaliatory for the several reports of violations they had allowed and her suspicions of others in the commission and reporting practices. She asked for them to review the reasons for her termination.

40.  Getting no response, she also sent a direct communication to CEO Mark Elwood, explaining her limited knowledge of why she had been terminated and requesting the termination be changed to reflect that it was not for cause, but a reduction in force, and allow for severance since she had offered to resign several times for the very reason given by Perkins for terminating her but they had persuaded her to stay and promised changes. She also sent an offer of waiver and release, requested a clarification on her non-compete in light of her having had no territory, and a demand for payment of PTO and back commissions.

VIII.   ELWOOD SUDDENDLY COMMUNICATES A NEWFOUND AND
BLATANTLY PRETEXTUAL "CAUSE" FOR GOLEY'S
TERMINATION IN ORDER TO DEFEAT GOLEY'S
UNEMPLOYMENT CLAIM AND THREATENS TO SUE IF GOLEY
TRIES TO FIND OTHER WORK

41.   The response of Lia Elliott, counsel for Elwood, was that Goley had been

terminated for cause and therefore did not have the right to her accrued PTO under

the Elwood policy and denied all of her requests, saying the back commissions would

be "looked into". Her non-compete would not be redefined and Elliott inferred they

intended to pursue litigation in any area Goley ever worked or travelled. Elliott also

issued a demand for all of the property of Elwood with a threat of calling the

authorities if not received by the end of the week.

42.   Goley applied for unemployment and was initially denied after Elwood

protested. On filing an appeal, the documents of support were sent to Goley and the

reasons for her dismissal were finally discovered.

43.   Following a request for documentation by the unemployment commission, in

light of the fact no documentation of discipline or performance issues could be found

prior to Goley's termination, Elwood had obtained obviously biased and non-

contemporaneous statements of Young, Lathrop, and Thompson specifically related

to the oil show. Those statements inferred unfounded suspicions of Goley using drugs

or alcohol, and irrelevant comments regarding her non-attendance at certain parts of

the oil show she was not scheduled to attend. Additional references to items left in

her trick or treat bucket and pictures were sent, although the materials were

presented out of context and were purposefully deceptive.

IX.   ELWOOD ACTUALLY ADMITS TO DISCRIMINATORY CONDUCT

44.   The very gravamen of Elwood's position was that they feared that Goley had "fallen off of the wagon," as Stockard had so elegantly stated before, despite the fact that there was not a single shred of evidence that Goley had engaged in any misconduct related to drugs or alcohol.  No one claimed to have seen her drink, much less drink to excess; no one claimed to have smelled alcohol on her breath, or seen her use or possess alcohol or drugs; there was no evidence that Goley had done any such thing.  No drug or alcohol tests were offered.  No counseling.  No debriefing session or chance to offer an explanation for anything.  Nothing but "you're fired," and the reason offered nothing more than a pretextual excuse for unlawful discrimination.

45.   Elwood's stated position, in fact, was an admission of a violation of settled law: Elwood *perceived or regarded* Goley as an active alcoholic—a well-established disability—but did so mistakenly and yet with intentional animus and discriminatory bias towards those with disabilities.

X.   GOLEY PROVES ELWOOD'S UNLAWFUL AND DISCRIMINATORY CONDUCT AND ELWOOD DOESN'T EVEN BOTHER TO SHOW UP

46.   In her appeal of the denial of her unemployment benefits, Goley submitted solid documentation in support of her request for benefits, refuting all statements made by Elwood and its witnesses.  Goley won the appeal for benefits on December 29, 2014.  No representative of Elwood even bothered to show up to defend its unlawful conduct.

47.   Goley has been unable to secure employment in her field based on the threat of litigation Elwood imposes on companies hiring former staff and the active

defamation of her name among internal and external industry members. Mrs.
Lathrop has since put in the position that Goley expressed an interest in.

48. In light of Stockard's improper, illegal, and discriminatory statements
regarding Goley, and the similar discriminatory statements made by others at
Elwood, it is obvious that Elwood's decision to demote Goley, expose her to ongoing
and repeated humiliation, harassment, and unfair scrutiny, to remove her from all
scheduled training and certification plans given to her peers, taking away her
territories, refusing to promote or pay her equally for the similar work of others, and
directing Perkins to dismiss Goley based on the unreliable, baseless, and biased
statements of those in the unemployment documents, constitutes unlawful
discrimination on the basis of a perceived disability.  Even worse, thinking Goley
might have been abusing alcohol or any other substance while she was in Texas and
then not only encouraging her to drive home to Oklahoma, but becoming angry when
she didn't, makes this conduct even more reckless, indecent and malicious.

49. The documents sent to the unemployment commission show that the policy
manual used in deciding to dismiss was the original manual given to her by SOS in
August of 2012. That manual also includes a detailed procedure for handling
suspicion of substance use that was not followed by Elwood in this case.

50. After Elwood discovered Goley was a recovering alcoholic, Goley received only
3 of the 70 necessary weekly ride-along management training sessions for the
Business Development Position, one each with Perkins, Powell, and Carattini. Her
requests for certification in the company's sales training went unanswered, then were

denied because the parameters were geared toward territory sales and she had been tasked to focus on a single company which made her ineligible. She was never given a trainer to assist in completing her Certified Staffing Professional testing, a certification extended to every other sales, management and branch employee within their first 6 months of hire. She was never given the company's employee referral compensation for those she referred in Jackson or Oklahoma City. She was never given compensation for the company's use of her personally developed training and community programs developed outside of her employment at Elwood.

CLAIMS FOR RELIEF

**COUNT I (Disability Discrimination)**

51. Plaintiff realleges the foregoing paragraphs as if fully rewritten herein.

52. Plaintiff is a qualified individual with a disability, is perceived as disabled, and/or has a record of a disability, as defined by the ADA.

53. Plaintiff could perform the essential functions of her position with or without reasonable accommodation.

54. Defendants discriminated against Goley with respect to her terms, conditions and privileges of employment as well as her discharge.

62. Defendants' acts in discriminating against Plaintiff on account of her disability, perceived disability and/or record of a disability include, but are not limited to, treating her less favorably than similarly situated non-disabled employees, and/or forcing her to accept a demotion and ultimately termination on account of her

disability, perceived disability and/or record of a disability, in violation of the ADAAA.

63.   Defendants engage in a pattern and practice of discriminating against individuals with disabilities, perceived disabilities, and/or records of disability.

64.   Defendants' actions were willful, wanton, malicious, and/or in reckless disregard of Plaintiff's rights.

65.   As a direct and proximate result of Defendant's unlawful conduct, Plaintiff has been injured and is entitled to judgment and compensation pursuant to federal law.

## COUNT II (Disability Retaliation)

66.   Defendants discriminated against Goley because she opposed any act or practice made unlawful by the ADA or because she made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under the ADA.

67.   Defendants also coerced, intimidated, threatened, and/or interfered with Goley in the exercise or enjoyment of her statutory rights.

68.   Defendants intentionally retaliated against Goley because of her opposition to disability discrimination and her support for and participation in a claim of disability discrimination, with respect to her terms, conditions and privileges of employment as well as her discharge.

69.   Defendants' intentional retaliation against Goley violated the ADA and was malicious and taken in reckless disregard of Goley's statutory rights.

## COUNT III (Disability Harassment)

70. During her employment with Elwood Staffing, Goley was subjected to a hostile work environment on account of her perceived disability.

71. The Defendants' harassment of Goley violated the ADA.

## COUNT IV (Defamation)

72. Plaintiff realleges the foregoing paragraphs as if fully rewritten herein.

73. Defendants and their agents told Plaintiff's coworkers that Plaintiff had "fallen off of the wagon" and was abusing alcohol.

74. Defendants' statements were false, malicious, and defamatory per se.

75. Defendants' statements damaged Plaintiff in her trade and profession.

76. At all times material, Defendants acted with actual malice, in that they knew or should have known that the statements about Plaintiff were false, and that making the statements would cause Plaintiff damage in her trade and profession.

77. Plaintiff was terminated from her employment with Defendant and has suffered embarrassment, humiliation, emotional distress, and injury to her professional and personal reputation because of these defamatory statements.

78. Defendant's actions were intentional, willful, wanton, malicious, and/or in reckless disregard of Plaintiff's rights.

83. As a direct and proximate result of Defendant's unlawful conduct, Plaintiff has been damaged and is entitled to judgment.

## CLAIM V (Tortious Invasion of Privacy)

84. Plaintiff realleges the foregoing paragraphs as if fully rewritten herein.

Respectfully submitted, this the 10th day of April, 2015.

By: _____

Bradley S. Clanton (MS Bar No. 10505)
CLANTON LEGAL GROUP, PLLC
P.O. Box 4781
Jackson, Mississippi 39296
Direct: (601) 454-8794
Toll Free: (844) 425-2686
Facsimile: (866) 421-9918
Email:  brad@clantonlegalgroup.com

Counsel for the Plaintiff